IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

ANTHONY DAVID TEAGUE,  §
TDCJ CID NO. 1976916,  §
                    Petitioner,  §
                              §
v.                            §     CIVIL ACTION NO. 4:16cv814
                              §     U.S. Magistrate Judge Johnson
LORIE DAVIS, Director,  §
Texas Department of Criminal  §
Justice, Correctional Institutions  §
Division,  §
                    Respondent.  §

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Anthony David Teague was convicted of stalking and sentenced to twenty years of incarceration by a Texas court. His petition should be denied and dismissed with prejudice because one of his claims is unexhausted and procedurally barred and his remaining claims lack merit.

## JURISDICTION

Teague seeks habeas corpus relief in this Court pursuant to 28 U.S.C. § 2254, which provides the Court with jurisdiction over the subject matter and the parties, as Teague was convicted within this Court's jurisdiction.

## PETITIONER'S ALLEGATIONS

The Respondent (Director) understands Teague's claims to be as follows:

1.    The jury instructions were erroneous;

2.    Ineffective assistance of trial counsel for failing to object to the erroneous jury instructions;

3.    Ineffective assistance of counsel for failing to properly select a jury;

4.   Ineffective assistance of appellate counsel for failing to raise the issue that State's Exhibit 4A should not have been admitted;

5.   Ineffective assistance of trial counsel for failing to investigate and impeach the victim;

6.   Ineffective assistance of trial counsel for failing to file a pre-trial motion to quash and dismiss or a pre-trial writ of habeas corpus on the grounds of selective or vindictive prosecution; and

7.   *Prosecutorial misconduct because in early 2015 the State dismissed another maliciously filed case against him and because the State knowingly used false evidence.*

ECF 1, at 11-14.

## GENERAL DENIAL

The Director denies all of Teague's assertions of fact except those supported by the record or specifically admitted herein. In addition, the Director opposes any future, substantive motions filed by Teague and will respond to any such motions only upon order of the Court.

## STATEMENT OF THE CASE

### I.   Procedural History

The Director has lawful custody of Teague pursuant to the judgment and sentence of the 219th Judicial District Court of Collin County, Texas, in cause number 366-82919-2013, styled *The State of Texas v. Anthony David Teague*. SHCR-03, at 133-35.[1] Teague was charged with stalking, entered a not guilty

---

[1]   "SHCR-03" refers to the Clerk's Record of state habeas pleadings in *Ex parte Teague*, No. 84,231-03, and is followed by the applicable page numbers. "CR" refers to the Clerk's Record of Teague's trial, followed by the applicable page numbers. "RR" refers to the Reporter's Record of Teague's trial, is preceded by the applicable volume number and followed by the applicable page numbers.

plea and was tried by a jury. *Id.* at 133. Teague was found guilty and sentenced by the jury to twenty years of incarceration on February 10, 2014. *Id.*

Teague's conviction was affirmed by the Sixth Court of Appeals of Texas on May 13, 2015. *Teague v. State*, No. 06-14-00053-CR, slip op. (Tex. App.–Texarkana 2015, pet. dismissed). Teague filed a petition for discretionary review, but then requested and was granted a voluntary dismissal of that petition on September 17, 2015. *Teague v. State*, PDR No. 0704-15 (Tex. Crim. App. 2015). Teague's state habeas application challenging the instant conviction was denied without written order on October 12, 2016. SHCR-03, at Action Taken. This proceeding followed on October 16, 2016. ECF 1, at 10.

## II.  Statement of the Facts

The state appellate court summarized the facts as follows:

> Rachel Kittrell and Anthony David Teague each uttered an understatement during the events leading to Teague's conviction by a Collin County1 jury for stalking Kittrell. Kittrell told Teague that she had made a mistake in consenting to a brief romantic relationship with him, and Teague told Kittrell that "maybe" he was "a bit obsessed" with her. Between their initial meeting during the summer of 2012 at SMU-in-Plano, where they both enrolled to pursue a graduate program in video game design, and Teague's October 31, 2012, arrest on the stalking charge, Teague's almost incessant communications to, and uninvited pursuit of, Kittrell proved both points.
>
> *          *          *
>
> Before the start of the 2012 fall semester, SMU created a Facebook page that allowed incoming students to get acquainted before classes began. Kittrell met Teague and her roommate, Haynie, through this Facebook page. She met Teague in person shortly after the 2012 fall semester began when a group of students met

for dinner. Kittrell and Teague talked often through Facebook, and they spent time together at group functions with fellow students. They talked frequently by telephone and through text messages. In short order, Teague informed Kittrell that he would like to have a romantic relationship with her. She, however, repeatedly told him that she was not interested because she had recently ended a relationship and was not ready to begin another one. Teague presented gifts to Kittrell on several occasions. With the exceptions of a lighter and cat toys, Kittrell refused to accept the gifts because it made her feel uncomfortable. Despite her repeated refusals, Teague continued lavishing gifts on Kittrell and was adamant that she accept them.

Teague sat behind Kittrell in class and would follow her outside when she took a break. He was jealous of other male classmates who interacted with Kittrell and would make derogatory comments about them. Teague continually told Kittrell that they "should kiss" and/or "have sex" because this was what Kittrell wanted. On or around August 21, 2012, Kittrell and Teague began a brief romantic relationship, which, according to Kittrell, lasted for a seven-to ten-day period. Kittrell testified that she quickly regretted the relationship and told Teague that she had made a mistake and that she was not comfortable continuing the relationship with him. Teague protested that they had not made a mistake and tried to convince Kittrell to continue their relationship. For a brief period of time, Teague relented and abided by Kittrell's wishes to discontinue their relationship. On one occasion, however, Teague and Kittrell were part of a group of students that went out for drinks after a test, and the romantic relationship was rekindled. On August 28, 2012, after meeting with her counselor, Kittrell felt emboldened and told Teague that their romantic relationship was over for good. What followed over the next several weeks, and eventually culminated in the involvement of law enforcement, was an avalanche of text messages, telephone calls, and uninvited and unwelcomed visits from Teague trying to convince Kittrell that she was making the wrong decision to stop seeing him.

On August 28, 2012, Teague sent Kittrell sixty-nine text messages. In the evening, Teague sent a text message and asked if they could talk after he got some work done and "calm[ed] down." Teague had

contacted Kittrell repeatedly that day in an attempt to convince her to see him in person. All of his requests were denied. Teague sent a text message to Kittrell at 11:52 p.m. advising her that, if she did not answer his text messages, he was going to come to her apartment.

At 12:07 a.m. on August 29, 2012, still receiving no response from Kittrell, Teague threatened Kittrell when he informed her that she would regret any effort to return a lighter he had given her. Just a few minutes later, Teague informed Kittrell that he was going to send a text message to a mutual friend via SMU's Facebook page revealing his romantic relationship with Kittrell. Teague then followed with a string of unanswered messages, including: "I['] m omw[FN11] over"; "Don't hang up on me."; "Answer. Now."; "I'm not coming over. Not worth my time."; "Just answer the call."; "We need to talk."; "I won't yell."; and "Please don't make me drive out there." Teague's messages continued with no response from Kittrell. At 4:48 a.m., in an apparent attempt to elicit a response from Kittrell, Teague sent messages indicating that he needed to know if Kittrell was all right and that, if he did not hear from her, he was going to call 9–1–1. Teague contacted law enforcement and had officers dispatched to Kittrell's apartment. On their arrival, Kittrell spoke with the officers. She then wrote to Teague asking him to "[p]lease stop" and to let her sleep.

[FN11] We assume this means "on my way" over.

At trial, Kittrell testified that, on August 30, 2012, Teague sent a text message to her stating that he needed her help because his car had broken down near her house. He asked her to come pick him up at that location. Kittrell informed Teague that she was not comfortable doing that. At that point, Teague informed Kittrell that he was dressed like a "school girl" and confided that he did not want anyone but Kittrell seeing him dressed that way. Kittrell testified that she sent Teague a text message telling him that she believed he was lying, and she persisted in her refusal to pick him up. Teague then admitted that his story was not true and that it was simply a ruse to see her in person. According to Kittrell, that was the point at which she became scared of Teague, both emotionally and physically. She informed Teague that she did not want to see him any place other than school, and she began

sleeping with a chair wedged under her door because she was afraid he might hurt her. Kittrell explained to the jury that she realized Teague was irrational, desperate, and quick to become angry and that she did not know what he was capable of. Kittrell was concerned that Teague would break into her apartment.

Following that event and in response to a barrage of text messages from Teague, Kittrell sent Teague a text message August 31, 2012, that stated, "Look, I'm trying to get work done and your texts are bothering and distracting me. Could you please just leave me be and give me space like you said you would?" The first two days of September, Teague sent Kittrell two text messages, but she did not respond to either. On September 3, 2012, Teague resumed his tiresome pattern of incessantly sending text messages to Kittrell. Kittrell repeated her requests that he leave her alone. On September 4, 2012,[FN12] Teague informed Kittrell that he was coming over to her apartment that evening to talk to her about a "practical idea." Kittrell eventually responded, telling Teague that she wanted to be left alone to do her school work and that she did not want to talk. After Teague's continued prodding, Kittrell wrote, "[I am] not comfortable with this. Please don't. Can't you just respect my feelings or call if you simply must say whatever it is." Teague responded, "No[.] I'm coming in person and you're just going to have to deal with it and it will be okay." Within the next few minutes, Kittrell repeatedly informed Teague that she did not want to see him in person and asked him to "stop." Teague explained to Kittrell that he was not "going to just go away." After completely ignoring Kittrell's instruction not to come to her apartment, Teague sent a text message stating, "I can't stay long, though. I have to hit the gym."

> [FN12] Teague sent Kittrell 151 text messages on September 4, 2012.

At that point, Kittrell wrote, "Don't come by. You're scaring me." Teague responded, "I understand, but I promise it will be fine. Aren't you ready to stop being scared? I just want some tea." Kittrell responded, "I'm not making tea. I'm not going to talk to you tonight. Don't come by. You're scaring me, and I want you to stop." Teague asked Kittrell if she was "calling the cops," and he then stated that he understood Kittrell's fear because he, too, felt

scared. Teague then sent Kittrell a message stating that he was "already en route" to her apartment, that he would only stay ten minutes, and that he was afraid she would call law enforcement and have him arrested.

Following several more text messages, Teague informed Kittrell that he was at her apartment, and he asked her to come downstairs. Kittrell closed the shutters, turned off all the lights, and sat in her room with the door closed. Teague knocked on her apartment door, but she refused to answer the door. Teague continued sending text messages to Kittrell, and Kittrell continued to ask him to leave. Again, Kittrell informed Teague that she was not comfortable talking to him in person. Teague responded that he understood Kittrell's discomfort and that she had "every right to feel that way." Finally, Kittrell relented and informed Teague that, if he would leave, she would talk to him on the telephone for ten minutes. Apparently, Kittrell's proposal was not satisfactory to Teague, and he continued asking to see her in person. In response to his continued requests, Kittrell answered "no" or "please go away" at least five more times. She also told Teague repeatedly that she was not comfortable seeing or talking to him in person. Teague again informed Kittrell that he understood her "anxiety" and asked her how he could make it easier for the two of them to talk in person. After sending another flurry of additional messages, Teague finally left Kittrell's apartment complex. Although he left, he did not stop interacting with Kittrell. He continued sending text messages, despite Kittrell "begging" him to please "just leave [her] alone."

On September 5, 2012, Teague sent a text message to Kittrell apologizing for his behavior and begging her to talk to him. Kittrell refused. Teague then began sending Kittrell text messages via Facebook on September 6, 2012. After several messages to Kittrell telling her, among other things, to "seriously die" and that the world needed less people like her in it, Teague sent the following string of text messages:

> [Y]ou deserve much worse[.] [N]ow f[ ] off before you
> get it[.]
> ....
> [S]top playing games with people[.] [Y]ou might pull

that s[ ] on the wrong person someday[.]

....

[W]ell if you are going to use me to play head and heart games[,][I]'m going to jerk off on the phone with you[.] [F]air trade[.] [B]itch[.] [N]ow get f [ ]ed and play with your cat or something[.] [What] the f[ ] do [I] care what you do[.] [B]ut burn in hell[.]

....

You are dead to me. Go to hell....

....

[Y]ou don't seem to feel pity for me[.] [Y]ou do respond to fear, though [.] [B]ut [I] hate using that tactic[.] [B]ut [I] get desperate[.]

....

[I]t's always a last resort[.] [W]e all use what works sometimes[.] ...

....

[I] don't like having to scare you[.] ...

....

[M]aybe [I] am a bit obsessed[.]

After continuing to ask Kittrell if he could see her in person, Kittrell informed Teague that she was "actively afraid" of what he might do if he got too upset. Later, Teague wrote, "[I]'d do just about anything for you [.]" Kittrell responded, "I don't want anything from you[.] Except to be left alone[.]" Teague replied, "[E]xcept that[.]" Teague continued, "[I]f you'd only care enough to talk to me about our problems." Kittrell responded, "[T]here is no 'us' or 'we' no 'our.' " Not to be thwarted, Teague replied, "[B]ut there is[.] [T]here was[.]" Before what seemed to be the end of this lengthy exchange, Teague wrote, "[Y]ou really shouldn't feel scared of me though[.]" He followed this statement by telling her that she should not feel scared of her own thoughts. Kittrell responded that she was not scared of her own thoughts, but of him.

On September 7, 2012, Teague began his text messaging tirade in the morning. While Kittrell was in class, Teague sent her a message via Facebook telling her that he would leave her alone forever if she would go to dinner with him. Although Kittrell informed Teague that she did not want to be alone with him, she eventually agreed and met him at Starbucks. Once Kittrell began

talking to Teague, she knew he had no intention of leaving her alone. Kittrell testified that she was afraid of Teague but that she was "desperate" and "naïve" and believed if she met with him in person that he would leave her alone. Kittrell also believed that, because Starbucks was always crowded with customers, it would be a safe place for them to meet.

At Starbucks, Teague tried to move closer to Kittrell, but she moved away in an attempt to maintain her distance from him. At one point, Teague attempted to kiss Kittrell, but she told him in a loud voice not to touch her. Kittrell realized she needed to leave, so she soon got in her car and left. Immediately after the Starbucks incident, Teague began calling Kittrell and sending her text messages in an attempt to talk to her again.

On September 8, 2010, Teague sent several text messages to Kittrell. Kittrell did not respond, and Teague sent a message demanding that she not ignore him and threatening that, if she did not show him "some respect," he was going to come to her apartment. In response, Kittrell warned, "Do not come to my apartment." After receiving repeated messages from Kittrell telling him that she did not want to see him, Teague sent a message stating that he was not leaving "this time." He continued, "One way or another you and I are going to talk tonight." After several more unanswered messages, Teague informed Kittrell that she was "[n]ot worth the gas" and that he would see her on Monday. Teague continued sending text messages to Kittrell, but she did not respond.

By September 12, 2012, Kittrell and her roommate had begun staying with friends because they were afraid to be alone in their apartment during the week. That weekend, when Kittrell's roommate was out of town, SMU provided Kittrell with a dorm room. The following weekends when her roommate was away, Kittrell had friends sleep over at her apartment because she was afraid Teague might break in and harm her.

Between September 8, 2012, and October 29, 2012, Kittrell contacted law enforcement regarding Teague's behavior on several different occasions, and her roommate contacted 9–1–1 on her own telephone once. Following her meeting with Teague at Starbucks,

between the late evening of September 7 and the early morning hours of September 8, 2012, Kittrell went to Cole Franklin's house, who was Kittrell's and Teague's classmate and a friend of Kittrell's. Kittrell told Franklin that the situation with Teague was getting out of hand and that it was "very overwhelming and scary." She needed someone to talk to about the situation and to get some advice as to how to handle it. While Kittrell was at Franklin's house, Teague sent her a video of a love song.

Recalling that Teague had mentioned Franklin earlier that day, Kittrell became even more afraid of Teague because now she believed that Teague was following her and knew where she was. On the evening of September 8, 2012, Kittrell went back over to Franklin's house to discuss the situation with him again. When she returned to her apartment, she found that her roommate was gone. Kittrell testified that Teague was repeatedly text messaging her and then informed her that he was coming over "and [that] this time he wasn't leaving." Kittrell called 9–1–1 for the first time because she had become afraid of him and that "he would hurt [her]."

On September 9, 2012, Teague had informed Kittrell that he was going to come to her apartment to deliver some of her things. Kittrell's roomate, Haynie, called the police because Kittrell was still afraid of what Teague might do. She testified that "he was irrational and he kept on insisting on seeing [her] in person." She stated, "And I didn't know why he was wanting to see me in person if not to hurt me because anything else you can say if you really want to say it, you can say it over the phone. And he just wouldn't stop." On that same day, the police told Teague to cease all contact with Kittrell.

After Kittrell called the police on those two occasions, she informed the University faculty that she was afraid of Teague and did not want him sitting behind her in class or following her after school. In response, the University issued Teague a "cease communication letter," instructing Teague to discontinue any further contact with Kittrell. Thereafter, Kittrell did not see Teague at school, but continued to contact her primarily through text messaging.

On September 13, 2012, Teague met with Plano Detective Phelan, who was investigating Teague's behavior. Detective Phelan told Teague that Kittrell no "longer wished any additional contact, wanted him to cease any and all conduct and that included telephone, email, voice mail, and that kind of thing." The detective also informed Teague that Kittrell was afraid of him. Teague told the detective that he understood and would cease contact with Kittrell. On September 18, 2012, Detective Phelan again told Teague that Kittrell was afraid of him, that she did not want any further contact with him, that she considered the relationship to be over, and that she "didn't want to speak with him." Phelan believed Teague understood the points he was communicating during their conversation.

It was not until October 22, 2012, that Kittrell phoned 9–1–1 again because of Teague's behavior. On that day, Kittrell was visiting Starbucks, which was in close proximity to the school and her apartment, but was not near Teague's residence. While there, Teague walked past her and asked her how she had been. Teague then sat down on a bench. When Kittrell felt she was safe enough to leave without Teague "grabbing" her, she went to her car, got in, and drove back to her apartment. A few minutes after Kittrell arrived home, Teague pulled into the apartment parking lot on his motorcycle and drove past the staircase leading to her apartment. At that point, Kittrell contacted the SMU Police Department and was advised to contact the Plano Police Department via 9–1–1. After following the instructions she was given, the Plano Police Department sent an officer to Kittrell's apartment. On his arrival, Kittrell informed him of the recent events and filed a report. Kittrell testified, "I was terrified because I knew he was there because of me. He followed me there. He often would go to places that were far away from where he lived because he knew I would be there. It was like he was hunting me or something."

On October 28, 2012, Kittrell and her friends were visiting at Franklin's apartment. When she went outside to leave, she found a pack of cigarettes above the door of the driver's side of her car. The cigarettes were the brand Kittrell smoked, and Teague was aware of this. On making this discovery, Kittrell called 9–1–1 on her way home. She also called 9–1–1 a second time on that date. Kittrell testified,

> I was, like, beyond terrified. I lost it. Because he had followed me to a friend's house. He knew I was there. He was clearly trying to leave some kind of message, although I don't know what, except to alert me to his presence. I just didn't feel safe.
>
> I asked two friends to follow me in their cars to go back home, and I called the police. I had one of my friends stay with me until the police showed up. And then when we got back home later that night around 4:00 in the morning I got a call from an unknown number and I answered it and it was him. So I told him not to contact me anymore and then I called the police again because for all I knew he was still in the area and I didn't want him—I didn't want him to—I just didn't want to be alone. I mean, my roommate was there, but I wanted police there. And so I called—I called the cops.

Teague telephoned Kittrell at least three times before the police officers arrived. After they arrived at her residence, Teague called her again. After handing one of the officers her telephone, the officer answered and informed Teague to stop contacting Kittrell and advised him that any further contact would be considered harassment. Teague was speaking so loudly that Kittrell could hear his voice and could tell he was agitated. In addition to the telephone calls Teague was making to Kittrell, he was also texting her and calling Kittrell's roommate's telephone.

*Teague v. State*, slip op. at 2, 14-24.

## STATE COURT RECORDS

Records of Teagues's trial, appeal, and state habeas proceedings are being filed with this Answer.

## EXHAUSTION/LIMITATIONS/SUCCESSIVE PETITION

Teague's claim 7, italicized in the Petitioner's Allegations Section, is unexhausted and procedurally barred. The petition is not barred by limitations, 28 U.S.C. § 2244(d), or subject to the successive petition bar, 28 U.S.C. § 2244(b).

## ANSWER

### I.    Standard of Review

Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405–06.

13

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Williams*, 529 U.S. at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. And as the Supreme Court recently described this relitigation bar, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,* 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado,* 541 U.S. at 664. This is particularly true when reviewing a state court's application of

14

*Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter,* 131 S. Ct. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state criminal justice systems," *not a substitute for ordinary error correction through appeal.*

*Id.* (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). Indeed, state courts are presumed to know and follow the law. *Visciotti*, 537 U.S. at 24. And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's relitigation bar nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Richter*, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. at 786–87 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand . . ." because such a process suggests the proposed rule is not clearly established. *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an

unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2).

An evidentiary hearing is precluded unless (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. *Williams v. Taylor*, 529 U.S. 420, 436 (2000). For example, a petitioner who does not present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). *Id.* at 433. However, § 2254(e)(2) has "force [only] where § 2254(d)(1) does not bar federal habeas relief." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011). Accordingly, even if a petitioner can leap the § 2254(e)(2) hurdle, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 1400. And whatever discretion remains after *Pinholster* to hold an evidentiary hearing, it still remains appropriate to deny such a hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007).[2]

---

[2]    Teague is not entitled to a hearing under this standard.

Additionally, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

## II.   Teague's Prosecutorial Misconduct Claim is Unexhausted and Procedurally Barred. (Claim 7)

Teague's prosecutorial misconduct claim is being raised for the first time on federal habeas corpus review. As a result, it is unexhausted and procedurally barred and this Court must dismiss the claim with prejudice.

The exhaustion doctrine requires that the state courts be given the initial opportunity to address and, if necessary, correct alleged deprivations of federal constitutional rights. *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). In order to satisfy the exhaustion requirement, a claim must be presented to the highest court of the state for review. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985); *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982). For purposes of exhaustion, the Texas Court of Criminal Appeals is the highest court in the state of Texas. *Richardson*, 762 F.2d at 431. To proceed before that court, a petitioner must either file a petition for discretionary review, Tex. R. App. P. 68.1, or an application for a post-conviction writ of habeas corpus. Tex. Code Crim.  Proc. Ann. art. 11.07 (Vernon 1977 and Vernon Supp. 1998).

All of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Picard v. Connor*, 404 U.S. 270, 275 (1971). In other words, in order for a claim to be exhausted, the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his assertions. *Id.* at 275-77. "[I]t is not enough . . . that a somewhat similar state-law claim was made." *Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). Where a "petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement." *Id.* at 259 (citing *Vela v. Estelle*, 708 F.2d 954, 958 n.5 (5th Cir. 1983)). "Exhaustion 'requires a state prisoner to present the state courts with the same claim he urges upon the federal courts.'" *Id.* at 261 (citing *Picard*, 404 U.S. at 276). Additionally, in order to satisfy the exhaustion requirement, the petitioner must have not only presented his claims to the highest state court, but he must have presented them in a procedurally correct manner. *Castille*, 489 U.S. at 351. When a petitioner raises a claim in a procedural context in which its merits will not be considered, he has not "fairly presented" the claim to the state courts, and, therefore, has not satisfied the statutory exhaustion doctrine. *Id.*; *Satterwhite v. Lynaugh*, 886 F.2d 90, 92-93 (5th Cir. 1989).

Teague has not exhausted claim 7 because he did not raise it on direct appeal and PDR or in his state writ application. SHCR-03, at 10-23. Therefore, by filing this federal writ of habeas corpus petition, Teague has bypassed the

state courts and attempted to present an original claim to the federal courts before the state court has had the opportunity to review it. Ultimately, Teague has prevented the state courts from ruling on, and if necessary, correcting, any constitutional errors that might have occurred in this case. *See Castille*, 489 U.S. at 349; *Picard*, 404 U.S. at 275.

However, notwithstanding Teague's failure to exhaust his state court remedies with respect to claim 7, it is procedurally barred from federal habeas corpus review.[3] Even though the claim has not been reviewed by the state courts, this Court may find it to be procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). The normal rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies and the state court to which he would be required to present his supporting facts would now find them to be procedurally barred. *Id.* In such cases, the federal procedural default doctrine precludes federal habeas corpus review. *Id.*; *see Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred); *see also Emery v. Johnson*, 139 F.3d 191, 196 (5th Cir. 1997) (same).

---

[3]      The amended version of § 2254(b) provides that a federal court may deny a petitioner's application for habeas relief on the merits, notwithstanding his failure to exhaust state court remedies. 28 U.S.C. § 2254(b)(2) (2007). As the Supreme Court explained, the exhaustion requirement "is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" *Gray v. Netherland*, 518 U.S. 152 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

Here, Teague has failed to exhaust his claim because he did not bring it on direct appeal and petition for discretionary review or in his state writ application. However, should this Court require Teague to present his claim to the Texas Court of Criminal Appeals to satisfy the exhaustion requirement, that court would find it to be procedurally barred under the Texas abuse of the writ doctrine, codified at Tex. Code Crim. Proc. Ann. art 11.07 § 4 (West Supp. 1996). The Fifth Circuit has noted that the Texas Court of Criminal Appeals applies its abuse of the writ rules regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995). Further, due to the 1995 amendment of the Texas habeas corpus statute, the Texas Court of Criminal Appeals has applied abuse of the writ even more regularly and strictly since *Fearance*. Now, the statute prohibits a Texas court from considering the merits of, or granting relief based on, a subsequent writ application filed after the final disposition of an inmate's first application unless he demonstrates the statutory equivalent of cause or actual innocence. Tex. Code Crim. Proc. Ann. art. 11.07 § 4(1)-(2).

Moreover, for this Court to reach the merits of the claim, Teague "must establish 'cause' and 'prejudice' from [the state court's] failure to consider his claim." *Fearance*, 56 F.3d at 642 (citing *Coleman*, 501 U.S. at 750-51). Teague has failed to argue, much less establish, cause and prejudice, and he has not shown that he is actually innocent of the crime for which he was convicted.

Accordingly, because Teague's claim 7 was never presented to the highest state court and is procedurally defaulted, this Court should dismiss it with prejudice as unexhausted and procedurally barred.

### III.   The Jury Was Properly Instructed. (Claim 1)

Teague alleges, in claim 1, that the jury instructions were erroneous. ECF 1, at 11. This claim is without merit.

The burden of demonstrating that an erroneous instruction is so prejudicial that it will support a collateral attack on the constitutional validity of a state court judgment is even greater than the showing required to establish plain error on direct appeal. Instructions that are "undesirable, erroneous, or even 'universally condemned'" do not necessarily warrant habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), (quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 643 (1974)). The only question is whether the instruction by itself rendered the trial fundamentally unfair, thus denying the defendant due process. *Id.* Moreover, the instruction may not be considered standing alone, but must be viewed in light of the entire instructions and the trial record. *Id.* Finally, "an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Teague fails to meet his burden to prove that the jury instructions rendered his trial fundamentally unfair. He alleges that he was improperly charged in the disjunctive, rather than the conjunctive. ECF 1, at 11. But the records reflects that the jury charge properly charged the elements of stalking in the conjunctive and the manner and means in which the stalking was committed in the disjunctive. CR 1712-1724. Disjunctive charging of the manner and means of committing an offense is proper under state and federal law. *See Schad v. Arizona*, 501 U.S. 624, 631-632 (1991) ("We have never

suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone.") (plurality opinion); *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (Holding that when an indictment alleges more than one method or means of committing a crime in the conjunctive, the trial court may properly charge the jury in the disjunctive).

Teague's defensive theory was that he committed the acts alleged in jury instructions, but that the proper charge was harassment, not stalking. 6 RR 192-206. It was clear from not just the jury instructions, but also the closing arguments, that the State had to prove all elements of the crime, including that Teague committed two or more instances/manner or means. CR 1712; 6 RR 192, 209. Viewed in light of the entire instructions and the trial record, it is clear that there was no error in the jury charge, much less that which rendered his trial fundamentally unfair.[4]

Further, the state court already considered and rejected this claim on habeas review. SHCR-03, at 10-11, Action Taken. Teague fails to prove that the state court's decision was contrary to, or an unreasonable application of

---

[4]     And to the extent that Teague argues that his right to a unanimous jury verdict was violated, not only is that claim meritless, there is no federal constitutional right to a unanimous jury verdict in state criminal proceedings. *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972); *see also Johnson v. Louisiana*, 406 U.S. 356, 359 (1972) ("[w]e note at the outset that this Court has never held jury unanimity to be a requisite of due process of law. Indeed, the Court has more than once expressly said that '[i]n criminal cases, due process of law is not denied by a state law . . . which dispenses with the necessity of a jury of twelve, or unanimity in the verdict.'" (citations omitted)); *Hoover v. Johnson*, 193 F.3d 366, 369 (5th Cir. 1999) (noting the Supreme Court has not held that the Constitution imposes a jury unanimity requirement on the states); *Keele v. Quarterman*, 185 F. App'x. 334, 335 (5th Cir. 2006); *Estrada v. Cockrell*, 77 F. App'x. 705, 707 (5th Cir. 2003).

23

Supreme Court law with respect to his claim. Therefore, Teague's claim 1 should be denied and dismissed with prejudice.

## IV.   Trial Counsel Was Not Ineffective. (Claims 2-3, 5-6)

In claims 2, 3, 5, and 6, Teague claims that trial counsel was ineffective for: failing to object to the erroneous jury instructions; failing to properly select a jury; failing to investigate and impeach the victim; and failing to file a pre-trial motion to quash and dismiss or a pre-trial writ of habeas corpus on the grounds of selective or vindictive prosecution. EFC 1, at 11-14. These claims are without merit and should be denied and dismissed with prejudice.

A defendant has the burden of establishing that he was deprived of effective assistance of counsel by a preponderance of the evidence. *Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). In *Strickland v. Washington*, the Supreme Court enunciated the familiar two-prong test for reviewing ineffective assistance of counsel claims. 466 U.S. 668, 687 (1984).

Under the first-prong of *Strickland*, a defendant must show that his trial counsel's performance was deficient. *Id.* In other words, the defendant must establish that his counsel's representation fell below an objective standard of reasonableness. *Clark*, 227 F.3d at 282. This showing requires a defendant to prove that his counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

A reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002) (citing *Strickland*, 466

U.S. at 689). Additionally, courts "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). Accordingly, courts "must be highly deferential" to counsel's performance. *Id.*; *see also Strickland*, 466 U.S. at 689. Every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Under the second-prong of the *Strickland* test, a defendant must show that his counsel's deficient performance prejudiced him. *Galvan*, 293 F.3d at 764. Thus, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Clark*, 227 F.3d at 283. "Even a deficient performance does not result in prejudice unless that conduct so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result." *Knox v. Johnson*, 224 F.3d 470, 479 (5th Cir. 2000) (quoting *Strickland*, 466 U.S. at 687). A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*. *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994). Because a defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Strickland*, 466 U.S. at 697.

As an initial matter, in denying Teague relief, the Texas Court of Criminal Appeals made an implicit credibility finding in counsel's favor. *See Valdez*, 274 F.3d at 948 n.11 Thus, counsel's statements in his affidavit on

state habeas review are presumptively correct facts under 28 U.S.C. §2254(e). Teague fails to overcome this presumption with clear and convincing evidence.

With regard to claim 2, that counsel failed to object to erroneous jury instructions, counsel explained on state habeas review that there was no error in the jury instructions. SHCR-03, at 42-44. The Texas Court of Criminal Appeals agreed by denying relief on Teague's claims 1 and 2. SHCR-03, at Action Taken. Counsel has no obligation to make meritless objections. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

In claim 3, Teague alleges that counsel was ineffective for failing to properly select a jury. ECF 1, at 12. Specifically, he claims that counsel kept a juror that was biased against him and struck a juror that was biased in his favor. *Id*. Teague complains that Juror Hernandez should have been struck for cause because she expressed obvious bias. SHCR-03, at 12. But a reading of the trial record reflects that Juror Hernandez understood that Teague was accused of a crime, was presumed innocent, and that she had to judge whether the prosecution proved his guilt. 2 RR 128-29. Teague fails to demonstrate that Hernandez was biased and, again, counsel has no duty to make meritless objections. *See Clark*, 19 F.3d at 966. With regard to prospective juror Draper, she suggested on the record that she had sympathy for Teague because she had recently gone to jail. 2 RR 100. Counsel explained on state habeas that while he could not remember exactly why he exercised a peremptory strike on her, the decision was based on a determination that she would be harmful to Teague or his trial strategy. SHCR-03, at 46. This Court is not free to second-

guess counsel's trial strategy. *Wilkerson*, 950 F.2d at 1065.

In claim 5, Teague argues that counsel was ineffective for failing to investigate the victim and impeach her with evidence that she fabricated the Starbucks incident. ECF 1, at 12-13. It is clear that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, in assessing unreasonableness a heavy measure of deference must be applied to counsel's judgments. *Id.* "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *see also United States v. Lewis*, 786 F.2d 1278, 1283 (5th Cir. 1986) ("[s]ince Lewis has not pointed out any evidence which would have been produced by a more thorough investigation, much less evidence that would be sufficient to undermine confidence in the outcome of trial, no prejudice has been shown."); *Alexander v. McCotter*, 775 F.2d 595, 602-03 (5th Cir. 1985).

Counsel explained on state habeas review that he did investigate the victim. He spoke with her multiple times on the phone and visited the Starbucks in question. SHCR-03, at 59-60 (no. 3). He found no evidence that the victim knew Teague would be at +Starbucks and only went there to fabricate evidence against him. *Id.* at 59-60 (nos. 3-5). Counsel made the strategic decision not to pursue this defense, a decision this Court cannot second guess. *Id.*; *Wilkerson*, 950 F.2d at 1065. Teague's claim is conclusory and cannot support relief. *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982)

("Mere conclusory statements do not raise a constitutional issue in a habeas case.").

Finally, in claim 6, Teague alleges that counsel was ineffective for failing to file a pre-trial motion to quash and dismiss or a pre-trial habeas writ on grounds of selective or vindictive prosecution. ECF 1, at 13-14. Specifically, he alleges that he was prosecuted because he filed a breach of contract civil action against Southern Methodist University. *Id.* at 13. With regard to this claim, counsel explained that he investigated and found it had no support. SHCR-03, at 60-61. Again, Teague's claim is conclusory and counsel has no duty to make meritless motions. *See Schlang*, 691 F.2d at 799; *Clark*, 19 F.3d at 966.

With regard to each of his ineffective assistance of counsel claims, Teague fails to demonstrate deficiency or prejudice. The state court's denial of relief on these claims was reasonable and Teague has not overcome the "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786. This Court should also deny relief.

## V.   Appellate Counsel Was Not Ineffective. (Claim 4)

Teague claims that appellate counsel was ineffective for failing to raise the issue that State's Exhibit 4A was improperly admitted. ECF 1, at 12. This claim is without merit.

With an ineffective-assistance-of-counsel-on-appeal claim, a petitioner must satisfy the two-pronged test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See Smith v. Robbins*, 528 U.S. 259, 286 (2000) (proper standard for evaluating appellate counsel is *Strickland v. Washington*). Thus, a petitioner must demonstrate counsel was deficient, and that the deficiency

prejudiced his case. *Strickland*, 466 U.S. at 687. Counsel's assistance becomes ineffective when counsel's errors are prejudicial, in that there is a reasonable probability that but for the error the ultimate result would have been different. So, to prove prejudice, a petitioner must show that but for counsel's deficient performance "he would have prevailed on appeal." *Smith*, 528 U.S. at 286.

Furthermore, to demonstrate deficiency he must show that "counsel unreasonably failed to discover [and raise] nonfrivolous issues." *Id.* Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select among them in order to maximize the likelihood of success on appeal." *Id.* at 765 (*citing Jones v. Barnes*, 463 U.S. 745 (1983)). Thus, it is possible that an ineffectiveness claim may be "based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id.* (*citing Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). So, to do this, he must show "that a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Gray*, 800 F.2d at 646.

With regard to Teague's claim that a challenge to State's Exhibit 4A should have been raised, appellate counsel explained that such claim was meritless. SHCR-03, at 50 (no. 12). Again, this is a presumptively correct fact which Teague must overcome with clear and convincing evidence. *Valdez,* 274 F.3d at 948 n.11; 28 U.S.C. §2254(e). Specifically, counsel explained that trial counsel raised appropriate objections to State's Exhibit 4A, that the State offered to redact the exhibit in response, and that the court's ultimate ruling was consistent with state law on the issue. *Id.* (citing *Montgomery vs. State* 810 S.W. 2d 372 (Tex. Crim. App. 1991)). Appellate counsel's decision not to

challenge the admission of the evidence was based on reasoned trial strategy. *Wilkerson*, 950 F.2d at 1065. Teague has failed to meet his burden to identify issues that are clearly stronger than an issue counsel did raise. *Gray*, 800 F.2d at 646.

Teague fails to demonstrate that counsel was deficient or that he was prejudiced. The state court's denial of relief on this claim was reasonable and Teague has not overcome the "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786. This Court should also deny relief.

## CONCLUSION

For the above reasons, the Director requests that the petition be denied and dismissed with prejudice, and that no certificate of appealability issue.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


*Lead Counsel

/s/ Jessica Manojlovich
JESSICA MANOJLOVICH*
Assistant Attorney General
State Bar No. 24055632

P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 936-1400
(512) 936-1280 (FAX)

ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing pleading has been served by placing the same in the United States Mail, postage prepaid, on this the 10th day of March, 2017, addressed to:  Anthony David Teague, TDCJ No. 1976916, Stiles Unit, 3060 FM 3514, Beaumont, TX 77706.


/s/ Jessica Manojlovich
JESSICA MANOJLOVICH
Assistant Attorney General